346 F.2d 677
 Rosita CHAPARRO, Administratrix of the Estate of Juan Orsini Carrera, deceased, and Gracia Orsini, an infant, by her mother, general guardian and next friend, Rosita Chaparro, Plaintiffs-Appellants,
v.
JACKSON & PERKINS COMPANY, Utica Mutual Insurance Company, Charles D. Reeves, Frank P. Smith and Arthur G. Schulz, Defendants-Appellees.
 No. 465.
 Docket 28650.
 United States Court of Appeals Second Circuit.
 Argued May 6, 1965.
 Decided June 7, 1965.
 
 Stanley F. Danzig, New York City (Dora Aberlin, New York City, on the brief, Yamil Galib Frangie, San German, P. R., Eugenio Sanchez Ruiz, Mayaguez, P. R., of counsel), for appellants.
 Ellsworth A. VanGraafeiland, Rochester, N. Y. (Wiser, Shaw, Freeman, Van-Graafeiland, Harter & Secrest, Rochester, N. Y., on the brief), for appellee, Jackson & Perkins Co.
 Clarence L. Burton, Rochester, N. Y. (Moser, Johnson & Reif, Rochester, N. Y., on the brief), for appellee Utica Mut. Ins. Co.
 William F. Martin, New York City (Martin, Clearwarter & Bell, New York City, on the brief), for appellees Reeves and Smith.
 Before MOORE, SMITH and HAYS, Circuit Judges.
 MOORE, Circuit Judge.
 
 
 1
 Juan Orsini Carrera was a Puerto Rican farm worker employed by the defendant Jackson & Perkins Co. (J&P) to work on its farms near Newark, New York. In the course of his employment in the summer of 1958 Carrera fell from a truck and struck his head. He was quickly taken to the Newark Medical Center where the defendant Dr. Davis examined him and had him sent to the Newark-Wayne Community Hospital. There he came under the care of the defendant Dr. Reeves, who found that he had a fractured skull. Three weeks later, after treatment in the hospital, Carrera was released and allowed to return to the J&P labor camp where he lived. Thereafter began a cycle of headaches, convulsions, and returns for medical care. In the course of this care, Carrera was referred by Dr. Reeves to defendant Dr. Terrero for an eye examination. He was eventually referred to defendant Dr. Smith, one of the country's leading neurosurgeons, at the defendant Strong Memorial Hospital in Rochester. There a subtemporal cranial decompression was performed and Carrera was later released again. More headaches followed, as did more hospitalization. Between stays in the hospital, Carrera was advised by the doctors to perform such work as he was able to manage for J&P, and he did do some light work. The last hospitalization began on May 10, 1960, and ended on May 14 with Carrera's demise. The County Coroner authorized an autopsy which was performed by a Dr. Thomas (not a defendant). The results showed massive brain damage which had been the cause of death. All parts of the body but the brain were replaced, and the body, after a funeral ceremony in Newark, was flown to Puerto Rico. The brain was kept and taken to Strong Memorial Hospital where it was dissected and examined by Dr. Smith.
 
 
 2
 Soon after the initial accident, workmen's compensation proceedings were under way, and Carrera was from the early stages represented by counsel. At no time did defendant Utica Mutual (compensation insurance carrier for J&P) contest the claimant's right to recovery or any proposed treatment. In fact, for treatment it paid $4,820. Nor did it fail to pay the required benefits. During his life, Carrera received $1,965 and death benefits at $9,271 were paid for the benefit of the plaintiff Gracia Orsini, Carrera's natural daughter in Puerto Rico.
 
 
 3
 Pursuant to the compensation act, $400 was paid to the defendant Schulz, an undertaker who had presented a bill for $993 to cover services, the three-day wake, and shipment of the body. An additional $500 was paid to Schulz by the defendant John Hancock Life Insurance Co., which was the carrier under a group life insurance policy covering J&P employees. Under the policy John Hancock had the discretion to deduct up to $500 to pay expenses equitably incurred.
 
 
 4
 The Workmen's Compensation Act provides the full and exclusive measure of recovery relating to Carrera's death unless it can be established that the defendants committed wilful, intentional wrongs. Consequently, the complaint, as amended, asserted against several combinations of defendants, twelve causes of action including assault, fraud and deceit, "wilful" negligence, malpractice, negligent supervision by the hospital, "aggravation" of the original injury, false imprisonment, involuntary servitude, peonage, slavery, conspiracy to deprive Carrera of his constitutional rights to equal protection of the laws and of his statutory rights under the workmen's compensation act, conspiracy to deprive the estate of the proceeds of the life insurance policy, unauthorized autopsy and unauthorized mutilation. For these wrongs, amounts ranging from $4,000 to $500,000 were sought, with eight claims seeking $250,000.
 
 
 5
 Most of appellants' legal propositions may be conceded, but the case still falls for lack of proof sufficient to support the allegations. Several of the claims assume that Carrera was so irrational that he was unable to give valid consent to the acts in question. But the evidence so fails to support the assertion that it was proper not to submit them to the jury. The record is similarly devoid of significant evidence suggesting that any of the defendants agreed to and did make false and fraudulent reports or recommendations as to the proper diagnosis and treatment of Carrera. Moreover, J&P and Utica had nothing to do with the selection of the doctors. They were also not responsible for the autopsy and mutilation, and the coroner's authorization would be sufficient to protect the operating doctors with respect to the autopsy. See Hassard v. Lehane, 150 App.Div. 685, 135 N.Y.Supp. 711 (1st Dep't 1912). Moreover, neither Dr. Reeves nor Dr. Smith actually performed the autopsy, and Dr. Reeves had nothing to do with the mutilation. As for Dr. Smith and the mutilation, see N.Y.Pub. Health Law, McKinney's Consol.Laws, c. 45, §§ 4210-15, even if the evidence sufficed to get the case to the jury, it would not be sufficient for a directed verdict. Even if it had, there would still have remained the question of damages. Here the trial court properly found no compensatory damages to be due as a matter of law, and the jury, properly instructed, chose not to award punitive damages.
 
 
 6
 As for the malpractice claims against Drs. Reeves and Smith, the jury verdict ends the matter. Directing a verdict for plaintiffs was simply out of the question, as was setting the verdict aside once rendered. The charge was proper and there was no error in rejecting plaintiffs' proffered instruction as to standard of care because it was too broad. See Benson v. Dean, 232 N.Y. 52, 133 N.E. 125 (1921).
 
 
 7
 The alleged conspiracy between J&P and Schulz was not sufficiently borne out by the evidence to justify sending the question to the jury. Irregularities, if any, as to the payment of the life insurance proceeds to Schulz would be the responsibility of John Hancock, which was not involved in the trial, and this conspiracy claim was properly dismissed as to J&P.
 
 
 8
 We have examined the record and the remaining claims relating to transfer of the case, certain calendar rulings, and allegedly prejudicial remarks by the court. We find neither abuse of discretion nor prejudice.
 
 
 9
 Affirmed.